IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 15-00190 LEK |
| Plaintiff, | ) | |
| vs. | ) | |
| TALANIVALU OLOTOA, | ) | |
| Defendant. | ) | |

**ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS STATEMENT OF DEFENDANT**

Before the Court is Defendant Talanivalu Ygnacio Olotoa's Motion to Suppress Statement of Defendant ("Motion"), filed on June 1, 2015. [Dkt. no. 16.] Plaintiff the United States of America ("the Government") filed its memorandum in opposition on June 12, 2015. [Dkt. no. 18.] This matter came on for an evidentiary hearing on July 16, 2015. On July 21, 2015, this Court issued an entering order stating that the Motion was DENIED ("7/21/15 EO Ruling"). [Dkt. no. 23.] The instant order supersedes the 7/21/15 EO Ruling.

**BACKGROUND**

On March 12, 2015, Mr. Olotoa was indicted for: one count of conspiracy to distribute and possess with intent to distribute fifty grams or more of methamphetamine, its salts, isomers, and salts of its isomers, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and § 846; one count of knowingly and intentionally distributing fifty grams or more of

methamphetamine, its salts, isomers, and salts of its isomers, in violation of § 841(a)(1) and (b)(1)(A); and one count of knowingly and intentionally distributing hydrocodone, in violation of § 841(a)(1) and (b)(1)(C).

In the instant Motion, Mr. Olotoa moves to suppress statements that he made to Drug Enforcement Administration ("DEA") Special Agents William DiTuro ("Agent DiTuro") and Ajay Patel ("Agent Patel"). Mr. Olotoa argues that this Court should suppress his statements because: Agents DiTuro and Patel questioned him after he informed them that he did not want to speak to them without an attorney present; he was not properly advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); and, even if this Court finds that he was properly advised of his <u>Miranda</u> rights; he did not knowingly, voluntarily, and intentionally waive those rights. During the evidentiary hearing on the Motion, this Court received exhibits offered by the Government and heard testimony from Agent DiTuro and Mr. Olotoa.

## I. **<u>Agent DiTuro's Testimony</u>**

Agent DiTuro testified that, on morning of January 30, 2014, he, Agent Patel, and four to six other DEA agents went to Mr. Olotoa's residence in Cosa Mesa, California. Agents DiTuro and Patel were in street clothes, and their holstered weapons and bulletproof vests were concealed by their clothes. Agents DiTuro

and Patel knocked on the door and asked Mr. Olotoa to come outside.  After Mr. Olotoa complied, Agent DiTuro explained that he was from Hawai`i and that he wanted to ask Mr. Olotoa some questions.  He also said that Mr. Olotoa was being detained and was going to be arrested.  Around this time, Mr. Olotoa informed them that he wanted to speak with a lawyer before speaking to them.

Mr. Olotoa was handcuffed and placed inside the DEA vehicle for transport to the DEA office in Los Angeles.  After Mr. Olotoa was in the vehicle, Agent DiTuro read him his rights, reading verbatim from the DEA 13A card.  See Exh. 100.  Mr. Olotoa acknowledged that he understood.

Agent DiTuro testified that it was approximately a one-hour drive to the DEA office.  Agent Patel was driving, Agent DiTuro was in the front passenger seat, and Mr. Olotoa was in the rear passenger seat.  According to Agent DiTuro, he engaged Mr. Olotoa in intermittent conversation.  Most of the conversation was between Agent DiTuro and Mr. Olotoa, with Agent Patel occasionally adding clarification.  Agent DiTuro denied that he interrogated Mr. Olotoa.

Agent DiTuro asked him standard questions about his health, such as whether he was on any medications.  Mr. Olotoa also asked him questions, including what was going on.  Agent DiTuro explained that Mr. Olotoa was being detained and that an

arrest warrant was being obtained.  Agent DiTuro also stated that the reason for detaining him before arrest was that the agents were hoping to discuss certain things with him before he was arrested.  Mr. Olotoa told them that he had never been arrested for a federal offense before.  Agent DiTuro responded by explaining the federal process to him, in an effect to try to put him at ease.  For example, Agent DiTuro explained that, after a hearing in California to confirm his identity, Mr. Olotoa would be taken back to Hawai`i to face the charges against him.  The identity hearing would occur either that day or the next day.  Mr. Olotoa asked Agent DiTuro what he was being charged with.  Agent DiTuro explained the changes and that the potential penalties included ten to twenty years of imprisonment.

According to Agent DiTuro, about three quarters of the way to Los Angeles, Mr. Olotoa asked him and Agent Patel what cooperating would entail.  Agent DiTuro explained what information Mr. Olotoa would have to provide and that he may be able to serve as a confidential source in the purchase of narcotics, or other similar activity.  Agent DiTuro told Mr. Olotoa that, if he did act as a confidential source, he would not be incarcerated so that he would be able to participate in transactions.  Agent DiTuro explained that Mr. Olotoa would still have to face the charges against him, but the prosecutor would be aware of the cooperation, and the prosecutor would determine how

the cooperation would affect the charges or the sentence.  Agent
DiTuro testified that, during the conversation, Mr. Olotoa never
expressed that he was having difficulty understanding what Agent
DiTuro told him.

After they got out of the vehicle at the DEA office,
and while they were still in the garage, Mr. Olotoa told Agent
DiTuro that he had changed his mind and wanted to answer
questions.  According to Agent DiTuro, this was not in response
to any statement that he made to Mr. Olotoa.  They went upstairs,
and placed Mr. Olotoa in an interview room.  Once they were in
the interview room, the agents removed Mr. Olotoa's handcuffs.
The agents provided Mr. Olotoa with water to drink, and gave him
the chance to use the restroom.

After the booking process, the agents again advised
Mr. Olotoa of his rights by providing him with an Advice of
Rights form to review.  Agent DiTuro asked Mr. Olotoa to read the
form and to initial each point to confirm that he read and
understood it.  Mr. Olotoa did so, and signed the form.  Agents
DiTuro and Patel signed the form as witnesses.  See Exh. 101.
Agent DiTuro testified that Mr. Olotoa reviewed the form for
approximately ten minutes, and Mr. Olotoa did not ask any
questions about the form, nor did he indicate that he could not
understand it.  After Mr. Olotoa signed the form, they asked him
to discuss his knowledge about parcels of methamphetamine that

were sent to Hawai`i.  Then, they asked him for information about current sources who he might be able to purchase drugs from, and Mr. Olotoa gave two names.  Agent DiTuro then left the room to type out Mr. Olotoa's statement.

Agent DiTuro presented Mr. Olotoa with the typewritten statement that he prepared and instructed Mr. Olotoa to review it, cross-out and initial anything that Mr. Olotoa felt was incorrect or inaccurate, and write in any changes.  Agent DiTuro also asked Mr. Olotoa to initial each paragraph of the statement to show that he read each one.  According to Agent DiTuro, Mr. Olotoa reviewed the statement for two to three minutes and then initialed and signed it without making any corrections or changes.  Agents DiTuro and Patel signed the statement as witnesses.  See Exh. 103.

Prior to signing the typewritten statement, Mr. Olotoa also signed the Written Waiver of Rights to Have a Judicial Determination of Probable Cause, to Be Taken Before a Federal Magistrate Judge, and to Have Counsel ("Probable Cause Waiver"). See Exh. 102.  Agent Patel testified that the purpose of this form is to postpone certain judicial proceedings due to an arrestee's willingness to cooperate.

Agent DiTuro testified that, throughout this process, neither he nor Agent Patel made any threats or promises to obtain Mr. Olotoa's statement and his cooperation.

## II. **Mr. Olotoa's Testimony**

Mr. Olotoa testified that there were five or six officers who accompanied Agents DiTuro and Patel to his residence, they were wearing visible bulletproof vests, and one or two of them had their guns out. Most of the agents had handguns, and one of the agents who had his weapon out had a rifle. Agent DiTuro asked Mr. Olotoa to accompany them in their vehicle so that they could ask him some questions. When Mr. Olotoa refused and said that he did not want to answer any questions without an attorney present, the agents immediately handcuffed and searched him. As Agents DiTuro and Patel were escorting him to their vehicle, Mr. Olotoa told his wife to call Chris Glew, Esq., who had previously represented a friend of his.

Mr. Olotoa acknowledged that, while he was in the vehicle, Agent DiTuro advised him of his right to remain silent. Mr. Olotoa testified that, later when Agent DiTuro brought up the possibility of him cooperating, Agent DiTuro said that it would be best for him if he cooperated. Agent Patel added that, if he made a statement and cooperated, he could be home for dinner that night. According to Mr. Olotoa, about mid-way through Agent DiTuro's explanation of the federal process, Mr. Olotoa stated that he need an attorney, and Agent DiTuro responded that his only option to avoid being sent to Hawai`i and serving ten to twenty years in prison was to cooperate. Toward the end of the

ride to Los Angeles, Mr. Olotoa asked to call his wife, but the agents told him that he could not do so at that time.

Mr. Olotoa confirmed that, in the garage of the Los Angeles DEA office, he changed his mind about giving a statement. However, he stated that he did so because he believed it was his only option that would allow him to go home. He also confirmed that he read the Advice of Rights form, but he testified that he only read it briefly, and he felt like he did not have enough time to review the forms that the agents gave him to sign. According to Mr. Olotoa, Agent DiTuro told him that they had to act quickly to avoid him having to leave for Hawai`i that day. Mr. Olotoa testified that he was under a lot of pressure when he signed the waiver forms. He signed the statement because he felt very afraid and just wanted to go home. After signing all of the waivers and the statement, Mr. Olotoa had his picture and fingerprints taken, and then the agents released him and took him to meet his wife. During this process, Mr. Olotoa never had the opportunity to consult with an attorney. He later learned that his wife called Mr. Glew, and Mr. Glew called the DEA office to inquire about Mr. Olotoa's arrest.

On cross-examination, Mr. Olotoa acknowledged that he asked Agent DiTuro a number of questions during the drive to Los Angeles, including what was going on and why he was being arrested. He also acknowledged that Agent DiTuro answered his

questions in a conversational tone of voice, without yelling or being verbally abusive. According to Mr. Olotoa, Agent DiTuro described the events that the charges arose out of, and he stated that he knew Mr. Olotoa was involved. Agent DiTuro's statement was in response to one of Mr. Olotoa's questions, and Agent DiTuro never asked what Mr. Olotoa did with respect to the parcel at issue in the charges.

**STANDARD**

The United States Supreme Court has recognized that, when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," he is entitled to certain "procedural safeguards." <u>Miranda</u>, 384 U.S. at 444. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Id.</u>

"<u>Miranda</u> is violated when a suspect is placed in custody and is then interrogated without receiving <u>Miranda</u> warnings or without knowingly, intelligently, and voluntarily waiving the rights described in those warnings." <u>United States v. IMM</u>, 747 F.3d 754, 764 (9th Cir. 2014). The Supreme Court has also recognized that:

> [The] traditional standard for waiver [is] not sufficient to protect a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel; "additional

9

> > safeguards" [are] necessary. [<u>Edwards v. Arizona</u>,] 451 U.S. [477,] 484, 101 S. Ct. 1880 [(1981)]. The Court therefore superimposed a "second layer of prophylaxis," <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991). <u>Edwards</u> held:
>
> > > "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S., at 484-485, 101 S. Ct. 1880.
>
> <u>Maryland v. Shatzer</u>, 559 U.S. 98, 103-04 (2010) (alterations in <u>Shatzer</u>). If the suspect initiates further dialogue,
>
> > <u>Edwards</u> makes clear that the right to have a lawyer present can be waived:
>
> > > "If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." 451 U.S., at 486, n.9, 101 S. Ct., at 1885, n.9.
>
> <u>Wyrick v. Fields</u>, 459 U.S. 42, 46 (1982) (per curiam).

**DISCUSSION**

I. **Interrogation**

Mr. Olotoa clearly invoked his right to an attorney when he informed Agents DiTuro and Patel at his residence that he would not answer questions without an attorney present. Thus, the agents could not interrogate Mr. Olotoa unless: 1) he initiated further dialogue with them; and 2) under the totality of the circumstances, he made a knowing, intelligent, and voluntary waiver of his rights.

"The term 'interrogation' refers to 'express questioning' or its 'functional equivalent,' which includes 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" United States v. Morgan, 738 F.3d 1002, 1005 (9th Cir. 2013) (quoting Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). This is an objective test; "the subjective intent of the police is relevant, but not conclusive." United States v. Washington, 462 F.3d 1124, 1132 (9th Cir. 2006) (citation omitted).

Mr. Olotoa invoked his right to an attorney before being transported to the DEA office in Los Angeles. During transport, Agent DiTuro read Mr. Olotoa his rights, reading verbatim from the DEA Form 13A card. See Exh. 100. Agent DiTuro

also engaged Mr. Olotoa in intermittent conversation, asking him standard questions, such as questions about his health and whether he was on any medications. Agent DiTuro testified that questions about a suspect's conditions are standard during any transport because the agents need to be aware of any ailments that the suspect has for purposes of the transport and to inform the agency that will be taking custody of the suspect. This Court FINDS that Agent DiTuro's actions did not constitute interrogation; they were activities "normally attendant to arrest and custody." See United States v. Morgan, 738 F.3d 1002, 1005 (9th Cir. 2013) (stating that following the "standard processing procedure" of advising an arrestee of his Miranda rights through "the reading of the I-214 Form is 'normally attendant to arrest and custody'").

Mr. Olotoa also initiated the discussion of other subjects, including asking the agents what was going on, stating that he had never been arrested for a federal offense before, and asking what cooperating would entail.[1] This Court finds that Mr. Olotoa's questions and comments "can be 'fairly said to

---

[1] Agent DiTuro testified that Mr. Olotoa asked him what cooperating would entail, but Mr. Olotoa testified that it was Agent DiTuro who brought up the possibility of him cooperating. Based on this Court's observation of each witness's testimony, and in consideration of the undisputed testimony about other questions that Mr. Olotoa asked, this Court finds Agent DiTuro's testimony to be more credible than Mr. Olotoa's testimony on the issue of who initiated the conversation about Mr. Olotoa's potential cooperation.

represent a desire' to 'open up a more generalized discussion relating . . . indirectly to the investigation.'"  See Mickey v. Ayers, 606 F.3d 1223, 1235 (9th Cir. 2010) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983)) (holding that Mickey was not interrogated during transport where he responded to small talk initiated by the agent, and he initiated the conversation about connections between his family and the agent's family).  Agent DiTuro responded to Mr. Olotoa's questions and comments by explaining, *inter alia*: why Mr. Olotoa was being detained; that the agents were hoping to discuss certain subjects with him before he was arrested; that he would be taken to Hawai`i to face the charges against him; what the charges were; and the potential penalties for the charges.  Agent DiTuro testified that he provided this information in response to Mr. Olotoa's questions to help Mr. Olotoa understand the process, which he hoped would put Mr. Olotoa's mind at ease.  Agent DiTuro testified that, in his experience, there are less complications during the transport of a suspect when the suspect understands what is happening to him or her.  At the hearing, Mr. Olotoa acknowledged that, during the transport, Agent DiTuro never asked him what he did in relation to the events at issue in the charges.

     Having considered all of the evidence in the current record, this Court CONCLUDES that the agents did not subject

Mr. Olotoa to interrogation during his transport to the DEA office in Los Angeles. The agents' statements, including the description of the charges against Mr. Olotoa and the potential penalties, were neither express questions nor the functional equivalent of interrogation. See United States v. Moreno-Flores, 33 F.3d 1164, 1169 (9th Cir. 1994) (The agent's statement that they "had seized approximately 600 pounds of cocaine and that [the defendant] was in serious trouble. . . . were not express questions. Nor did they constitute the functional equivalent of interrogation." (citation omitted)).

Once they arrived at the DEA office in Los Angeles, Mr. Olotoa informed the agents that he wanted to cooperate. The agents informed him of his rights again, had him execute the Advice of Rights form, and began questioning him about the events that were the subject of the charges, and other related matters. The Court cannot conclude that Mr. Olotoa was questioned, or subjected to the functional equivalent of questioning, at any time prior to signing the Advice of Rights form, which waived his rights, including his right to remain silent and his right to speak to an attorney. Based on the record before it, this Court CONCLUDES that the agents properly advised Mr. Olotoa of his rights, including his rights under Miranda. Thus, the issue before this Court is whether, under the totality of the circumstances (one of which is Mr. Olotoa's initiation of

discussions after he invoked his right to counsel), Mr. Olotoa knowingly, intelligently, and voluntarily waived his rights.

## II. Waiver

"A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th Cir. 2005) (some citations and internal quotation marks omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). The agents advised Mr. Olotoa of his rights orally during transport, using the DEA 13A card, [Exh. 100,] and again in the interview room, where Mr. Olotoa acknowledged and waived those rights on both the Advice of Rights form and the Probable Cause Waiver [Exhs. 101, 102]. Those forms explicitly set forth that he had a right to remain silent and a right to speak to an attorney. Mr. Olotoa testified that he read both of these forms before initialing and signing them, although he stated that his review of both was brief. There is no indication that Mr. Olotoa was without understanding or ability to understand these forms. Indeed, he testified that he is a high school graduate, is able to read and write in English, and is employed as a technician with AT&T. Olotoa also admitted to seven arrests prior to his arrest in this case, and that five of those arrests culminated in

convictions.  He testified that he was advised of his constitutional rights each time he was arrested, and he admitted that, at the time of his arrest on January 30, 2014, he had a basic understanding of his rights, including the right to remain silent.  This Court also notes that, before being placed in the agents' vehicle, Mr. Olotoa instructed his wife to call Mr. Glew.  Based on his prior experiences, Mr. Olotoa was aware that he could wait to speak with a law enforcement officer until Mr. Glew, or another attorney, was present.  This Court therefore CONCLUDES that, under the totality of the circumstances, Mr. Olotoa's waiver of his rights was knowing and intelligent.

Mr. Olotoa also argues that his waiver was not voluntary because he was afraid, and the agents led him to believe that cooperating was the only way that he could go home to his family in Costa Mesa, California rather than be taken immediately to Honolulu to face the charges in this matter.  The Ninth Circuit has stated that:

> An admission "is involuntary if coerced either by physical intimidation or psychological pressure." United States v. Shi, 525 F.3d 709, 730 (9th Cir. 2008) (quoting United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003)).  We look to see "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (internal quotation marks omitted).  When assessing the voluntariness of an admission, we consider "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of

>                the interrogation." Id. at 434, 120 S. Ct. 2326;
>                see Shi, 525 F.3d at 730.

Mickey, 606 F.3d at 1233.

There is no allegation that the agents used physical intimidation to obtain Mr. Olotoa's confession. There is no evidence of any violence or threat of violence, and Mr. Olotoa's interrogation did occur under extreme physical conditions. Once they arrived at the DEA office, the agents gave Mr. Olotoa the chance to use the restroom, and they gave him water to drink. They also removed his handcuffs. Further, the agents completed the interrogation and took Mr. Olotoa to meet his wife later the same day.

Mr. Olotoa's contention is that the agents obtained his confession through promises and improper psychological influence. Mr. Olotoa testified that Agent Patel told him that, if he cooperated and made a statement, he could return to his family in time for dinner. Agent DiTuro, however, testified that he did not believe Agent Patel used those words. According to Agent DiTuro, Agent Patel merely explained that, if Mr. Olotoa agreed to be a confidential source, he would probably stay out of jail so that he could participate in undercover operations. Agent DiTuro testified that Agent Patel made no threats or promises to Mr. Olotoa to obtain his cooperation.

Even if this Court accepts Mr. Olotoa's testimony that Agent Patel promised him that he could be home by dinner time if

17

he cooperated and that this was his sole motivation for waiving his rights and giving his statement, this Court cannot find that the psychological pressure of such a promise was so great as to overcome Mr. Olotoa's will. The Ninth Circuit has stated that, to support a finding that the defendant's will was overborne:

> The interrogation techniques of the officer must be "the kind of misbehavior that . . . shocks the sensibilities of civilized society . . . ." Moran v. Burbine, 475 U.S. 412, 433–34, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Colorado v. Connelly, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

Ortiz v. Uribe, 671 F.3d 863, 869 (9th Cir. 2011) (some alterations in Ortiz). Agent Patel's purported promise to Mr. Olotoa was not the type of coercive behavior that would shock society's sensibilities. Rather, the decision that Mr. Olotoa was confronted with is virtually identical to the decision that every arrestee who has the opportunity to be a confidential source must face.

Having considered the totality of the circumstances, this Court FINDS that Mr. Olotoa's confession was not obtained as a result of any threats of violence, promises, or improper influence, and it CONCLUDES that his waiver of his rights was voluntary. This Court therefore CONCLUDES that the agents obtained Mr. Olotoa's confession after they obtained a valid

waiver of his rights, including the right to remain silent and the right to speak to an attorney.

**CONCLUSION**

On the basis of the foregoing, Olotoa's Motion to Suppress Statement of Defendant filed June 1, 2015, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, July 31, 2015.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**UNITED STATES OF AMERICA vs. TALANIVALU OLOTOA; CRIMINAL 15-00190 LEK; ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENT OF DEFENDANT**